## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BROADSTRIPE, LLC, et al., | ) | Case No. 09-10006 (CSS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| JAMES CABLE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 09-00114 |
| | ) | |
| MILLENNIUM DIGITAL MEDIA | ) | Related Adv. Docket No. 104 |
| SYSTEMS, L.L.C. (d/b/a BROADSTRIPE), | ) | |
| HIGHLAND CAPITAL MANAGMENT, | ) | |
| L.P., AND HIGHLAND CAPITAL | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION[1]

RICHARDS, LAYTON & FINGER, P.A.
Gregory V. Varallo
C. Malcolm Cochran, IV
Blake Rohrbacher
One Rodney Square
920 N. King Street
Wilmington, DE  19801

Counsel for Plaintiff James Cable, LLC

ABRAMS & LASTER LLP
J. Travis Laster
Eric D. Selden
20 Montchanin Road, Suite 200
Wilmington, DE  19807

Counsel for Defendant Millennium
Digital Media Systems, L.L.C.

Dated:  September 1, 2010

Sontchi, J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

1

## INTRODUCTION

Before this Court is the defendant Millennium Digital Media Systems, L.L.C.'s (partial) Motion to Dismiss the Verified Amended Complaint (the "Motion") filed by James Cable, LLC.  The Complaint, as defined below, alleges, among other things, (i) anticipatory repudiation of the asset purchase agreement,[2] (ii) tortious and bad faith breach of the APA, and (iii) civil conspiracy related to the defendant's and Highland's (as defined below) alleged breach of the APA.  The defendant argues that the Complaint fails to state a claim upon which relief can be granted.  For the reasons set forth below, the Court grants the (partial) motion to dismiss.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A), (B) and (O).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    *Procedural History of Bankruptcy Cases*

On March 20, 2008, James Cable, LLC ("James Cable") filed a complaint in the Court of Chancery of the State of Delaware ("Chancery Court") seeking declaratory and injunctive relief related to the anticipatory repudiation of the APA by defendant

---

[2]  As discussed more fully below, on October 31, 2007, James Cable and Broadstripe entered into an asset purchase agreement (the "APA"), pursuant to which Broadstripe agreed to buy substantially all of James Cable's cable and internet assets, as defined in the APA as the "System."

Millennium Digital Media Systems, L.L.C.'s ("Broadstripe").[3]    James Cable later amended its complaint (the "Complaint").[4]  On May 8, 2008, Broadstripe filed a motion to dismiss all counts against it in the Amended Complaint, except for the breach of contract claim.   In January, 2009, Broadstripe commenced its Chapter 11 cases by filing voluntary petitions in this Court.   In October, 2009, the Chancery Court action was removed to this Court, including the pending partial motion to dismiss filed by Broadstripe.  Briefing has been completed, the parties have waived their request for oral argument, and this matter is ripe for the Court's consideration.

## II.    Factual History

### a.    The Parties

Plaintiff, James Cable, is a Delaware limited liability company with its principal place of business in Michigan.   James Cable owns and operates cable television systems and provides internet service to customers in various geographic markets in the United States.

The remaining defendant in this action is Broadstripe.   Broadstripe is a Delaware limited liability company with its principal place of business in Missouri.

---

[3]  James Cable also moved for expedited proceedings.   The Chancery Court, after argument, denied James' request for expedited proceedings.   Transcript of Mar. 27, 2008 Teleconference, *James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, No. 3637-VCL (Del. Ch.) (Apr. 9, 2008, No. 17).

[4]  The Complaint, as amended, also named Highland Capital and Highland Capital Management L.P. (collectively, "Highland") as defendants.  The Complaint alleged the following against Highland: claims of promissory estoppel, breach of contract (with James Cable as third-party beneficiary), tortious interference with contract and civil conspiracy.  In June, 2008, Highland filed a motion to dismiss all counts against them.  After argument, the Chancery Court granted Highland's motion.  *See James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, No. 3637-VCL, 2009 Del. Ch. LEXIS 102 (Del. Ch. June 11, 2009).

Like James Cable, Broadstripe owns and operates cable television systems and provides internet services to customers in the United States.   Broadstripe is also a provider of telephone services.

Highland Capital Management, L.P. and Highland Capital (collectively referred to herein as "Highland") are alleged to have controlling ownership in Broadstripe.[5]

b.   *The Asset Purchase Agreement*

On October 31, 2007, James Cable and Broadstripe entered into an asset purchase agreement (the "APA"), pursuant to which Broadstripe agreed to buy substantially all of James Cable's cable and internet assets, as defined in the APA as the "System."   The APA includes a formula for calculating the purchase price based, in part, on the number of subscribers to be transferred.   At the time of the filing of the amended complaint, James Cable alleged that the value of the System was over $ 115 million according to the APA's formula.[6]   The APA does not contain a financing contingency provision in favor of Broadstripe.

---

[5]  Highland is not a party to this adversary proceeding.  Therefore, the Court makes no finding regarding Highland's ownership of Broadstripe.

[6]  Key Revenue Generating Unit ("KRGU") was defined in the APA as "the sum of Basic Subscribers and High Speed Data Units. For the avoidance of doubt, a subscriber may be counted as a Basic Subscriber and also counted as a High Speed Data Unit." The purchase price calculation was based, *inter alia*, on the number of KRGU's transferred.  The APA required a minimum of 57,000 KRGU's and set no maximum. Broadstripe was, however, required to list any discounts provided to customers on Schedule 4.23 of the APA and was required to operate the business in the usual, regular, and ordinary course.

In the APA, Broadstripe represented that it had the financial capability to consummate the transaction.[7]   The amended complaint alleges that Broadstripe and Highland communicated to James Cable that Highland was the source of Broadstripe's financial capability.   It further alleges that these representations "were sufficient to convey to a reasonable businessman that Broadstripe possessed the right to require Highland to fund the APA transaction, and that Highland had agreed to be so bound." Highland, however, is not a party to the APA and Highland did not enter into a commitment letter or any other written agreement to fund the transaction.

The APA designates the laws of the State of Delaware as the choice of law in the event of disputes between the parties.[8]

c.   *Dispute Arises Between Broadstripe and James*

On February 14, 2008, the parties agreed to work towards a closing by the month's end.   A week later, Broadstripe's CFO informed James Cable's CFO that Broadstripe would be unable to close at the end of the month because it was unable to deliver the purchase price.   James Cable alleges that Highland convinced Broadstripe to breach the APA because Highland no longer liked the economics of the deal and wished to avoid funding the transaction.   From late February until mid-March, James

---

[7]  Section 5.5 of the APA is as follows:

> 5.5  <u>Financial Capability</u>.  Buyer has the financial capability necessary to consummate the transactions contemplated in this Agreement, the Related Agreements and other documents contemplated herein, including payment of the Purchase Price.

[8]  *See* Complaint, Ex. A, APA, §21 ("The Agreement shall be interpreted and governed by the laws of Delaware without giving effect to those principles of conflict of law that may require the application of the laws of a jurisdiction other than Delaware.").

Cable and its controlling owner, GoldenTree Asset Management LP, engaged in numerous conversations with Highland and Broadstripe regarding the transaction. James Cable demanded adequate assurances that the deal would close. Highland and Broadstripe told James Cable it had no reason to be insecure, but refused to provide assurances that they would proceed to closing.

   d.  *The Original Complaint*

On March 20, 2008, James Cable filed its original complaint in this action in the Court of Chancery for the State of Delaware ("Chancery Court") seeking a declaration that Broadstripe committed a material anticipatory breach and repudiation of the APA.  The Chancery Court held a hearing on James Cable's motion to expedite on March 27, 2008.[9]  At the hearing, Broadstripe argued that it had not repudiated the APA and indicated a willingness to close as soon as the closing conditions were met.  Also at the hearing, Broadstripe stated that the representation about its financial capability to complete the transaction was true when made and that it then had the financial capability to finance the deal through existing equity investors, such as Highland Capital, new equity investors, and through the debt markets.  The Chancery Court denied James Cable's motion to expedite and suggested that the parties set a date certain for closing.[10]

---

[9]  Based on the transcript of the telephonic hearing, at this hearing the parties did not present evidence to the Chancery Court.  *See* Transcript of Mar. 27, 2008 Teleconference, *James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, No. 3637-VCL (Del. Ch.) (Apr. 9, 2008, No. 17).

[10]  *Id.*

*e.   The Disputes Continue*

From late-March until mid-April, the parties exchanged a series of letters regarding various disputes related to the APA.  This exchange came to an end on April 16, 2008, when Broadstripe sent a letter to James Cable purporting to terminate the APA.  Broadstripe's letter claimed that James Cable was in material breach of the APA by (1) giving away free premium channels in the Westlake-Moss area and (2) dramatically raising its number of subscribers by materially increasing its use of door-to-door contractors, materially increasing its use of free installations, and introducing an amnesty program.  In its April 16 letter, Broadstripe also stated that because of those breaches it could not rely on the preliminary adjustment report by James Cable identifying 66,997 KRGU's.  James Cable alleges that these purported breaches are not grounds for termination of the APA and are merely excuses by Broadstripe and Highland to avoid their obligations related to the APA.  James Cable asserts that Broadstripe knew about the Westlake-Moss area subscriber issue since June 2007 and that the efforts to increase subscribers were made in the ordinary course of business.

*f.   The Amended Complaint*

On April 21, 2008, James Cable responded to Broadstripe's April 16 letter and stated that if Broadstripe did not rescind its letter within 48 hours it would deem Broadstripe's repudiation as final and would treat the repudiation as a breach of the APA.  Broadstripe failed to rescind its letter and, on April 24, 2008, James Cable filed its amended complaint.

In its amended complaint, James Cable claims that Broadstripe breached the APA by a complete and final repudiation the APA.[11]  James Cable also claims that Broadstripe breached the APA tortiously and in bad faith.[12]  Lastly, James Cable claims civil conspiracy against Broadstripe and Highland who alleged acted in confederation and combination to dishonor the APA in bad faith and tortiously.

---

[11]  Count I asserts that Broadstripe breached the APA as follows:

> a. by repudiating the APA without basis or right,
> b. by purporting to terminate the APA contrary to the terms of the APA,
> c. by asserting claims of breach of the APA that are unfounded, or that are not material and could not reasonably be thought to be material,
> d. by asserting claims of breach of the APA in bad faith,
> e. by failing to give timely notice of breach,
> f. by using purported breaches as a "get out of jail free card,"
> g. by failing to proceed with diligence to closing,
> h. by misrepresenting its (lack of) intention to close,
> i. by not authorizing sufficient funding to pay the Purchase Price,
> j. by failing to close the APA transaction,
> k. by failing to pay the Purchase Price, and
> l. by anticipatorily repudiating the APA in February.

Complaint, at ¶151.

[12]  Count II asserts that Broadstripe committed "bad faith breach of contract" as follow:

> 157.  Among other things, Broadstripe's allegations that James [Cable] purportedly breached the APA:
>> a.  Were made by Broadstripe for the purpose of giving Broadstripe an excuse to kill the deal,
>> b.  Were the result of buyer's remorse on the part of Broadstripe,
>> c.  Were known by Broadstripe to be without basis in fact or law when made,
>> d.  Were known by Broadstripe to challenge sound business decisions of James and to place those decisions in a false light, and
>> e.  Were made for the purpose of permitting Broadstripe's parent and controlling owner, Highland Management, to avoid its duty to finance the APA transaction.
>
> 158.  Broadstripe's refusal to honor the APA was done tortiously and in bad faith.

Complaint, at ¶¶ 157-58.

James Cable also asserted various claims against Highland.  James Cable claimed that Highland tortiously interfered with the APA and engaged in civil conspiracy with Broadstripe to dishonor the APA.  James Cable also alleged that Highland acted in bad faith in an attempt to insulate itself from its alleged obligation to fund the transaction.  Furthermore, James Cable claimed that it is entitled to recovery against Highland based on a promissory estoppel theory due to Highland's statements that allegedly amount to a promise to provide funding for the transaction.  Lastly, James Cable claims that Highland breached an agreement with Broadstripe to provide funding for the transaction and alleged that James Cable was a third party beneficiary of that agreement.

g.  *The Motions To Dismiss*

Both Broadstripe and Highland filed motions to dismiss the Complaint. In November 2008, the Chancery Court heard argument on the defendants' motions to dismiss and reserved judgment.  On January 2, 2009, Broadstripe filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware seeking protection under Chapter 11 of the Bankruptcy Code.  Consequently, all claims against Broadstripe in the Chancery Court were automatically stayed under 11 U.S.C. §362(a). James Cable filed a motion for relief from stay to continue the Chancery Court action against both Broadstripe and Highland.  On March 3, 2009, the Court denied the stay relief motion thereby continuing the stay against Broadstripe, and ruled that the

litigation between James Cable and Highland was not stayed pursuant to §362 of the Bankruptcy Code.[13]

h.  *The Chancery Court Dismisses the Claims Against Highland*

Thereafter, the Chancery Court dismissed all claims against Highland finding that the allegations against Highland were conclusory, unsupported by specific facts, and inconsistent with the structure of the APA.[14]  The Chancery Court found that the facts in the Complaint did not support the allegation that Highland was obligated to fund the transaction.[15]  The Chancery Court further held that James Cable failed to allege any "definite and certain" promise Highland made that could have possibly induced James Cable to enter into the APA.[16]  The Chancery Court continued that James Cable did not adequately allege facts to support the existence of a contract between Highland and Broadstripe under which the Chancery Court could analyze James Cable's purported rights as third party benefactor.[17]  Lastly, the Chancery Court dismissed the civil conspiracy claim against Highland as the claim of civil conspiracy is not an independent cause of action and must arise from some underlying wrong, none of which survived the motion to dismiss.[18]

---

[13]  *See* D.I. 281.

[14]  *James Cable,* 2009 Del. Ch. LEXIS 102, at *12.

[15]  *Id.* at *17.

[16]  *Id.* at *20.

[17]  *Id.* at *25.

[18]  *Id.* at *28-29.

*i.   James Cable's Claims Against Broadstripe Currently Pending in the Bankruptcy Court*

In October 2009, the action as against Broadstripe was removed to this Court, including the pending partial motion to dismiss filed by Broadstripe. Briefing has been completed, the parties have waived their request for oral argument, and this matter is ripe for the Court's consideration.

## LEGAL DISCUSSION

**I.   *The Standard Regarding Sufficiency of Pleadings When Evaluating a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted.***

A motion under Rule 12(b)(6)[19] serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[20] "Standards of pleading have been in the forefront of jurisprudence in recent years."[21] With the Supreme Court's recent decisions in *Bell Atlantic Corp. v. Twombly*[22] and *Ashcroft v. Iqbal*,[23] "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[24]

---

[19]   Federal Rules of Civil Procedure 8(a) and 12(b)(6) are made applicable to this adversary proceeding pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012, respectively.

[20]   *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) ("The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." (citations omitted)).

[21]   *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209 (3d Cir. 2009).

[22]   550 U.S. 544 (2007).

[23]   129 S. Ct. 1937 (2009).

[24]   *Fowler*, 578 F.3d at 210.

In *Iqbal*, the Supreme Court makes clear that the *Twombly* "facial plausibility" pleading requirement applies to all civil suits in the federal courts.[25] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss.[26]   Rather, "all civil complaints must now set out sufficient factual matter to show that the claim is facially plausible."[27]   A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[28]   Determining whether a complaint is "facially plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.[29] But where the well-pleaded facts do not permit the court to infer

---

[25] *See Fowler*, 578 F.3d at 210.

[26] *Iqbal*, 129 S. Ct. at 1949.  *See also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (citations omitted); *Bartow v. Cambridge Springs SCI*, 285 Fed. Appx. 862, 863 (3d Cir. 2008) ("While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions.); *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001)  ("Liberal construction has its limits, for the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists on which relief could be accorded the pleader. Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.  While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions." (citations omitted)).

[27]  *Fowler*, 578 F.3d at 210 (internal quotations omitted).  *See also Iqbal*, 129 S. Ct. 1950 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Buckley v. Merrill Lynch & Co. (In re DVI, Inc.)*, 2008 Bankr. LEXIS 2338 (Bankr. D. Del. Sept. 16, 2008) ("Rule 8(a) requires a showing rather than a blanket assertion of an entitlement to relief.  We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only fair notice, but also the grounds on which the claim rests."(citations omitted)).

[28]  *Iqbal*, 129 S. Ct. at 1949.

[29]  *Iqbol*, 129 S. Ct. at 1950.  "It is the conclusory nature of [plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.* at 1951.

more than the mere possibility of misconduct, the complaint has alleged - but not shown - that the pleader is entitled to relief."[30]

After *Iqbal*, the Third Circuit has instructed this Court to "conduct a two-part analysis. First the factual and legal elements of a claim should be separated. The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[31] The court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief."[32]

## II.    The Plausibility of Plaintiff's Claims for Relief.

### a.    Count I: The Claim of Anticipatory Repudiation Against Broadstripe.

Count I of the Complaint is based on breach of contract claims. James Cable asserts various theories of breach of the contract,[33] including anticipatory

---

[30]  *Id.* at 1950 (citations and internal quotations omitted).

[31]  *Fowler*, 578 F.3d at 210-11. *See also Twombly*, 550 U.S. at 555 (holding that a court *must* take the complaint's allegations as true, no matter how incredulous the court may be); *Iqbal*, 129 S. Ct. at 1949-50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . When there are well-plead factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007); *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004). The Court may also consider documents attached as exhibits to the Amended Complaint and any documents incorporated into the Amended Complaint by reference. *In re Fruehauf Trail Corp.*, 250 B.R. 168, 183 (Bankr. D. Del. 2000) (*citing PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "[I]f the allegations of [the] complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint." *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005). *See also Sunquest Info. Sys., Inc. v. Dean Whitter Reynolds, Inc.*, 40 F. Supp. 2d 644, 649 (W.D.Pa. 1999) ("In the event of a factual discrepancy between the pleadings and the attached exhibit, the exhibit controls." (citations omitted)).

[32]  *Fowler*, 578 F.3d at 211 (internal quotations omitted) ("[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." (citations omitted)). "The plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim." *Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.)*, 2008 Bankr. LEXIS 2338, at *13 (Bankr. D. Del. Sept. 16, 2008).

[33]  *See* note 11, *supra*.

repudiation of the APA in February 2008.  Broadstipe moves to dismiss the anticipatory repudiation portion of Count I of the Complaint arguing that (i) the Chancery Court already ruled against James Cable on this issue when deciding the motion to expedite; (ii) even if the Chancery Court's ruling was not directly on point, the Chancery Court made conclusions, including ruling that no closing date was established by the parties in February 2008, that would make establishing a claim for anticipatory repudiation impossible; and (iii) even if this Court disregarded the Chancery Court's findings at the hearing on the motion to expedite, Broadstripe did not make any express or unequivocal statements that it would not proceed with the sale in February 2008 and, in fact, continued to work towards closing with James Cable.

James Cable responded arguing that the Chancery Court did not make substantive findings at the hearing on the motion to expedite, and if the Chancery Court did make substantive rulings those rulings were only preliminary and were not made on a complete factual record.  James Cable then further details its claim of anticipatory repudiation against Broadstripe.

       *i.    Doctrine of Law of the Case*

The doctrine of law of the case is as follows: once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.[34]  This doctrine is one of both fundamental fairness and judicial efficiency.[35]

---

[34] *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) ("[T]he doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the

"The law of the case doctrine provides that when a court actually decides a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  However, that doctrine only applies to issues that were actually litigated and decided by the court."[36]  Law of the case directs a court's discretion, it does not limit the tribunal's power.[37]  "The law of the case doctrine does not act as an absolute bar on re-litigation (in contrast to the doctrines of claim and issue preclusion).  Rather the law of the case doctrine merely directs the court's discretion not to rehear matters ad nauseam."[38]

---

same issues in subsequent stages in the same case." (citations omitted)); *Arizona v. California*, 460 U.S. 605, 618 (1983) ("As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 210 n. 7 (3d Cir. 2003) ("Under the law-of-the-case doctrine, "once an issue has been decided, parties may not relitigate that issue in the same case."); *In re Resyn Corp.*, 945 F.2d 1279, 1281 (3d Cir. 1991) ("The doctrine of the law of the case dictates that when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation."); *In re IT Group, Inc.*, 322 B.R. 729, 736 (Bankr. D. Del. 2005).  *See also Odyssey Partners v. Fleming Co.*, C.A. No. 14770, 1998 WL 155543, at *1 (Del. Ch. Mar. 27, 1998) ("The law of the case doctrine requires that matters previously ruled upon by the same court should be put to rest.").

[35] *Foxmeyer Drug Co. v. GE Capital Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546, 556 (Bankr. D. Del. 2002) ("It is important to note that law of the case rules come into play only with respect to issues previously determined, … and that questions that have not been decided do not become law of the case merely because they could have been decided." (citations and internal quotations omitted)).  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (U.S. 1988) ("This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." (citations and internal quotations omitted)).

[36] *Philip Servs. Corp. v. Luntz (In re Philip Servs.)*, 267 B.R. 62, 66 (Bankr. D. Del. 2001) (citations omitted).

[37] *Arizona v. California*, 460 U.S. 605, 618 (1983).  *See also Joy Global, Inc. v. Wis. Dep't of Workforce Dev. (In re Joy Global, Inc.)*, 381 B.R. 603, 612 (D. Del. 2007) ("Even where the law of the case doctrine applies, it does not bar reconsideration of an issue in certain "extraordinary circumstances," including where there has been a change in the law or where reconsideration is necessary to prevent clear error or injustice.").  *Accord N. Apparels, Inc. v. PNC Bank, Nat'l Ass'n (In re Forman Enters.)*, 271 B.R. 483, 487 (Bankr. W.D. Pa. 2002) ("The doctrine of the law of the case is not, however, an iron-clad rule limiting the power of a federal court in such instances.  It instead merely directs the court's exercise of its jurisdiction.").

[38] *Philip Servs. Corp. v. Luntz (In re Philip Servs.)*, 267 B.R. 62, 67 (Bankr. D. Del. 2001) (*citing Arizona v. California*, 460 U.S. 605, 618 (1983); *Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (law of the case doctrine does not limit court's power, rather it merely expresses practice of courts to refuse to reopen what has been decided)).  *See also Raquel v. Education Management Corp.*, 196 F.3d 171, 183 (3d Cir. 1999); *In re*

The Chancery Court made various comments and rulings in relation to James Cable's motion to expedite the proceedings; however, the facts and rulings were made in a preliminary posture.[39]  In deciding a motion to expedite proceedings, the Chancery Court considers a balancing test to decide whether the plaintiffs have sufficiently articulated a threat of irreparable injury that would justify an expedited hearing.[40]  Also when considering a motion to expedite, the Chancery Court also

RBGSC Inv. Corp., 253 B.R. 352, 363 (E.D. Pa. 2000) ("Law of the case restrictions apply to subsequent rulings by the same judge in the same case or a closely related one. Although a trial judge has the power to reconsider an earlier decision, its authority to do so is limited by two prudential considerations: First, the court must explain on the record the reasoning behind its decision to reconsider the prior ruling. Second, the court must take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling."  (citations and internal quotations omitted)); *FSQ, Inc. v. Integrated Health Servs. (In re Integrated Health Servs.)*, 358 B.R. 637, 641 (Bankr. D. Del. 2007).

[39]  *See Giammargo v. Snapple Beverage Corp.*, C.A. No. 13845, 1994 Del. Ch. LEXIS 199, at *6-7 (Del. Ch. Nov. 15, 1994) ("In this instance the balancing of various factors leads me to conclude that plaintiffs have not sufficiently articulated a threat of irreparable injury that would justify the imposition of the costs of the preliminary injunction process.  Of course *their claims remain for adjudication* and it is the central component of my analysis of this application, that should those claims later be adjudicated as having merit, the court will be in a position to shape a decree that will fully compensate plaintiffs for any loss they may suffer." (emphasis added)).  *See also United States v. United States Smelting Refining & Mining Co.*, 339 U.S. 186, 198-99, 70 S. Ct. 537, 544, 94 L. Ed. 750 (1950) (holding that an order granting a preliminary injunction is not a final judgment on the merits and, therefore, does not trigger the rule of practice of law of the case); *Continental Energy Assocs. Ltd. Pshp. v. Hazleton Fuel Mgmt. Co. (In re Continental Energy Assocs. Ltd. Pshp.)*, 206 B.R. 344, 346 (Bankr. M.D. Pa. 1996) (same); *FSQ, Inc. v. Integrated Health Servs. (In re Integrated Health Servs.)*, 358 B.R. 637, 641 (Bankr. D. Del. 2007) (holding that when a court considers a motion to dismiss the court is requires to accept all factual assertions in the light most favorable to the non-moving party whereas no such consideration is warranted in the context of a motion for summary judgment, therefore, the law of the case doctrine was not applicable); *Accord McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) (concluding that "our holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment"); *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) (concluding that "[i]nterlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case."); *Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 69-70 (3d Cir. 1999) (holding that "while the law of the case doctrine bars courts from reconsidering matters actually decided, it does not prohibit courts from revisiting matters that are 'avowedly preliminary or tentative'" and, therefore, court was free to determine the merits of the case despite the issuance of a preliminary injunction); *Foxmeyer Drug Co. v. GE Capital Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546, 557 (Bankr. D. Del. 2002) (holding that a denial of a summary judgment motion constitutes law of the case but only with respect to the substance of that which is actually decided).

[40]  *Giammargo v. Snapple Beverage Corp.*, C.A. No. 13845, 1994 Del. Ch. LEXIS 199, at *6-7 (Del. Ch. Nov. 15, 1994).

determines whether monetary damages would compensate the plaintiff for their (alleged) injuries, if so, a motion to expedite is unwarranted.[41]   As a result, the application of the doctrine of the law of the case would be inequitable to the merits of James Cable's claims.  The Chancery Court did not fully litigate James Cable's claims against Broadstripe nor make findings of law or fact on the merits of James Cable's claims.  As a result, the Court will consider the merits of James Cable's anticipatory repudiation claim against Broadstripe.

 ii.   *Anticipatory Repudiation*

Delaware law supports the principle that "a party [to a contract] is excused from performance . . . if the other party is in material breach" of his contractual obligations.[42]  Anticipatory repudiation is a breach occurring before there has been any breach by non-performance.[43]  "A party confronted with [anticipatory] repudiation may respond by (i) electing to treat the contract as terminated by breach, (ii) by lobbying the repudiating party to perform, or (iii) by ignoring the repudiation. Although perhaps counterintuitive, whether repudiation amounts to a present breach is predicated on the promisee's response."[44]

---

[41]  *Giammargo*, C.A. No. 13845, 1994 Del. Ch. LEXIS 199 at *7.

[42]  *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).  *See also Brasby v. Morris*, C.A. No. 05C-10-022-RFS, 2007 Del. Super. LEXIS 73, at *11 (Del. Super. Mar. 29, 2007).

[43]  E. Allen Farnsworth, *Contracts* §8.20 (1982).

[44]  *West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 Del. Ch. LEXIS 23 (Del. Ch. Feb. 23, 2009).

Broadstripe argues that the Complaint fails to state a claim for anticipatory repudiation in February 2008. Although Broadstripe refused to give James Cable adequate assurances, Broadstripe informed James Cable that "James [Cable] had no reasonable grounds to be insecure that Broadstripe will not perform under the APA."[45] Furthermore, after the hearing on the motion to expedite the proceedings, Broadstripe continued to work with James Cable towards closing.

James Cable's responds that its anticipatory repudiation claim is based on the request for adequate assurances and the subsequent refusal by Broadstripe to provide them. James Cable also defensively asserts that their subsequent efforts to close the APA transaction did not undermine their anticipatory repudiation claim.

> (a)    *Restatement (Second) of Contracts §251*

The Restatement (Second) of Contracts (the "Restatement") states:

(1)   Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the oblige a claim for damages for total breach under §243, the oblige may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he received such assurance.

(2)   The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.[46]

---

[45] Complaint, Ex. C.

[46] *Restatement (Second) of Contracts* §251 (1981).

The comments to §251 state: "When, therefore, an obligee *reasonably believes* that the obligor will commit a breach by non-performance that would of itself give a claim for damages for total breach (§243), he may, under the rule stated in this Section, be entitled to demand assurance of performance."[47]  The comment continues to advise that this rule may be modified by agreement of the parties.[48]

Section 251 of the Restatement has not been squarely adopted by the Delaware Courts.  As such, it is a matter of unsettled/undecided state law whether a party to a contract may demand adequate assurances of future performance for non-Uniform Commercial Code ("UCC") contracts.

### 1.    Adequate Assurance Pursuant to Restatement §251

Although the Delaware Courts have not squarely adopted Restatement §251, the Chancery Court has relied on the guidance provided by the comments to Restatement §251.[49]  Thus, this Court will also look to Restatement §251 for guidance rather than presuming to adopt Restatement §251 on behalf of the Delaware state courts. [50]

---

[47] *Restatement (Second) of Contracts*, §251, cmt. a (1981) (emphasis added).

[48] *Restatement (Second) of Contracts*, §251, cmt. a (1981).

[49] *Frontier Oil Corp. v. Holly Corp.*, C.A. No. 20502, 2005 Del. Ch. LEXIS 57, at *103 n. 184 (Del. Ch. Apr. 29, 2005) ("The Restatement provides the following guidance as to the nature of a demand for adequate assurances: 'A party who demands assurances must do so in accordance with his duty of good faith and fair dealing in the enforcement of the contract. . . .  Whether a particular demand for assurance conforms to that duty will depend on the circumstances.  The demand need not be in writing.  Although a written demand is usually preferable to an oral one, if time is of particular importance the additional time required for a written demand might necessitate an oral one.' *Restatement (Second) of Contracts*, § 251, cmt. d.").

[50] Section 251 has been adopted in other jurisdictions. *See, e.g., Lo Re v. Tel-Air Commc'ns Inc.*, 490 A.2d 344, 350 (N.J. Super. 1985) (finding that the basis for adopting §251 is the "general commercial contractual duty of 'good faith and fair dealing,' firmly rooted in our jurisprudence." (citations omitted)); *Conference*

Similarly, the Second Circuit certified a similar question regarding Restatement §251 to the Court of Appeals of New York.[51]  The Court of Appeals of New York was presented with a long-term contract regarding the purchase of electricity between an independent power producer and a public utility provider.[52]  The Court of Appeals was persuaded that the UCC §2-609 bridged an important gap in the sale of goods context in relieving the uncertainty regarding a parties' performance.[53]

---

*Ctr. Ltd. v. TRC-The Research Corp of New Eng.*, 455 A.2d 857, 863-64 (Conn. 1983) ("[W]e find support for recourse to § 2-609 as a source of general law in the provisions of § 251 of the Restatement (Second) of Contracts.  Those provisions, which are not limited to contracts for the sale of goods, permit any obligee with reasonable grounds for insecurity to demand adequate assurance of due performance and to treat as a repudiation an obligor's failure to respond with an adequate assurance within a reasonable time."); *Carfield & Sons, Inc. v. Cowling*, 616 P.2d 1008, 1010 (Colo. Ct. App. 1980)  (finding that if a party to a contract reasonably believes that a breach has occurred, in order to avoid liability under the contract, the party is obligated to request adequate assurance of performance.  If that assurance is refused, only then could the party treat the contract as terminated.); *Jonnet Dev. Corp. v. Dietrich Indus., Inc.*, 463 A.2d 1026, 1032, n.8 (Pa. Super. Ct. 1989) ("Section 251 of the Restatement differs from Section 250 . . . in that Section 250 concerns actual repudiations by the obligor whereas Section 251 concerns the existence or non-existence of reasonable grounds for the obligee to believe that the obligor will repudiate the contract.  Under Section 251 an obligor has not yet announced by word or deed that he definitely is repudiating the contract, i.e., that he will not perform when the time for his performance arises under the contract.  But the obligor has given the obligee reasonable grounds to believe that he will repudiate the contract at some future time.").

[51]  *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 110 F.3d 6 (2d Cir. N.Y. 1997) (The Second Circuit certified the following question: "Does a party have the right to demand adequate assurance of future performance when reasonable grounds arise to believe that the other party will commit a breach by non-performance of a contract governed by New York law, where the other party is solvent and the contract is not governed by the U.C.C.?".)

[52]  *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 460 (N.Y. 1998).

[53]  *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 465 (N.Y. 1998).  The Court of Appeals stated:

> UCC 2-609 has been considered so effective in bridging the doctrinal, exceptional and operational gap related to the doctrine of anticipatory breach that some States have imported the complementary regimen of demand for adequate assurance to common-law categories of contract law, using UCC 2-609 as the synapse (*see, e.g., Lo Re v Tel-Air Communications*, 200 NJ Super 59, 490 A2d 344 [finding support in UCC 2-609 and Restatement (Second) of Contracts § 251 for applying doctrine of adequate assurance to contract to purchase radio station]; *Conference Ctr. v TRC--The Research Corp. of New England*, 189 Conn 212, 455 A2d 857

Ultimately, the Court of Appeals found that its jurisprudence was an incremental common-law development process rather than a process that encouraged promulgation of a sweeping a change and proposition in contract law.[54]  The Court of Appeals was persuaded that the policy underlying Restatement §251 should apply with a similar cogency as UCC §2-609, the sale of goods counterpart.[55]  The court then found that the contract at issue was sufficiently analogous to a sale of goods (such as oil and gas, which would be governed by the UCC).[56]  Therefore, although the Court of Appeals did not adopt Restatement §251, it did find that the parties were entitled to demand

---

[analogizing to UCC 2-609, as supported by Restatement (Second) of Contracts § 251, in context of constructive eviction]).

Commentators have helped nudge this development along. They have noted that the problems redressed by UCC 2-609 are not unique to contracts for sale of goods, regulated under a purely statutory regime. Thus, they have cogently identified the need for the doctrine to be available in exceptional and qualifying common-law contractual settings and disputes because of similar practical, theoretical and salutary objectives (*e.g.*, predictability, definiteness, and stability in commercial dealings and expectations) (*see, e.g.*, Campbell, *The Right to Assurance of Performance under UCC § 2-609 and Restatement [Second] of Contracts § 251: Toward a Uniform Rule of Contract Law*, 50 Fordham L Rev 1292, 1299-1304 [1982]; *see generally*, White, *Eight Cases and Section 251*, 67 Cornell L Rev 841 [1982]; Dowling, *A Right to Adequate Assurance of Performance in All Transactions: U.C.C. § 2-609 Beyond Sales of Goods*, 48 S Cal L Rev 1358, 1358-1360, 1386-1387 [1975]).

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 465 (N.Y. 1998).

[54]  *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 467 (N.Y. 1998) ("[T]his Court chooses to take the traditionally subtler approach, consistent with the proven benefits of the maturation process of the common law, including in the very area of anticipatory repudiation which spawns this relatively newer demand for assurance corollary.").

[55]  *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 468 (N.Y. 1998).

[56]  *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 468 (N.Y. 1998). *But see Bank of N.Y. v. River Terrace Assoc., LLC*, 2005 NY Slip Op 9033, 2 (N.Y. App. Div. 1st Dep't 2005) ("The long-term construction loan agreement at issue is not analogous to a sales contract, as was the contract in Norcon to supply electricity generated at the Norcon facility to a public utility provider for a 25-year period, so as to warrant extension of the doctrine to the facts presented here.")

adequate assurances as the contract at issue was similar to a sale of goods and as such, was persuaded that UCC §2-609 and Restatement §251 were applicable to the case presented.[57]

In the James Cable/Broadstripe dispute, the APA contemplates the sale of KRGU's, which is analogous to the electricity sold in the *Norcon* line of cases and the sale of goods under the UCC.  The Court finds that the sale of goods and Restatement §251 apply in this instance.   As Restatement §251 applies, the Court must then determine if James Cable appropriately demanded adequate assurances from Broadstripe.

### 2.       Did James Cable Appropriately Demand Adequate Assurances?

James Cable claims that Broadstripe anticipatorily repudiated the APA because it failed to give adequate assurances in response to James Cable's reasonable request for such assurances.  Broadstripe responds that James Cable's claims fail on two grounds: (i) Broadstripe was not obligated at all times to have the adequate funds to close the APA; and (ii) no closing date was set on February 29, 2008, so James Cable's concerns regarding Broadstripe's ability to close could not have made James Cable insecure.

---

[57] *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 468 (N.Y. 1998) ("It should apply to the type of long-term commercial contract between corporate entities entered into by Norcon and Niagara Mohawk here, which is complex and not reasonably susceptible of all security features being anticipated, bargained for and incorporated in the original contract.").

Viewing James Cable's factual statements in the Complaint as true,[58] James Cable's insecurity concerning Broadstripe's statements[59] appears facially plausible.  Furthermore, although the parties contractually agreed that Broadstripe had the financial capability to close the transaction;[60] James Cable was not demanding adequate assurances related solely to the closing price, James Cable was seeking adequate assurances related to Broadstripe's performance under the APA.[61]  However, no closing date had been set by James Cable at the end of February,[62] and James Cable specifically agreed to forego financing language in the APA.[63]  Therefore, based on the factual assertions set forth in the Complaint, it does not appear that Broadstripe was under any obligation to perform in February 2008.  Therefore, although it is plausible that James Cable to have reasonable grounds to believe that Broadstripe did not have the financing to close the transaction, Broadstripe was under no obligation to provide

---

[58]  *See Fowler*, 578 F.3d at 210-11.

[59]  According to the Complaint, on February 21, 2008, the Chief Financial Officer of James Cable had a telephone conversation with the Chief Financial Officer of Broadstripe wherein the Broadstripe CFO states that Broadstripe would be unable to close at the end of February because Broadstripe was unable to deliver the purchase price.  Complaint, at ¶33.  On February 22, 2008, a principal of Highland spoke with a principal of James Cable's indirect controlling owner GoldenTree Asset Management ("GoldenTree") and stated that he believed Broadstripe's board has approved the APA at $85-90 million (less than the minimum price of $98 million based on the minimum number of KRUGs).  Complaint, at ¶¶34-38.  On the same date, a Highland principal again spoke with a principal at GoldenTree and allegedly stated that Broadstripe could not finance the transaction.  Complaint, at ¶38.

[60]  *See* Complaint, Exh. A (APA §5.5).

[61]  *See* Complaint, Exh. B (Letter from Kate Adams, James Cable, to William Shreffler, Broadstripe, (Mar. 6, 2008)).

[62]  At the hearing on the motion to expedite, James Cable's counsel stated: "We did not send a formal letter at that time saying 'We demand you close on the 29th.'" Transcript of Mar. 27, 2008 Teleconference, at p. 16, ln. 18-20, *James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, No. 3637-VCL (Del. Ch.) (Apr. 9, 2008, No. 17).

[63]  *See* Complaint, Ex. A, APA, §5.5.

proof of financial ability to close the transaction nor was the closing of the transaction imminent as no closing date was set in February 2008.

Furthermore, this finding is consistent with the Chancery Court's ruling on the motion to expedite when it found that no closing date had been set by the parties, which would give rise to James Cable's claims of anticipatory repudiation.[64]

> (b)    *Anticipatory Repudiation By Clear and Precise Statements Concerning Non-Performance.*

"The law generally has acknowledged for more than one hundred years that an unequivocal statement by a promisor that he will not perform his promise gives the injured party an immediate claim to damages for total breach, in addition to discharging the remaining duties of performance."[65]

> A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions.  Repudiation may be accomplished through words or conduct.  A party may repudiate an obligation through statements when its language, reasonably interpreted, indicates that it will not or cannot perform; alternatively, a party may repudiate through a voluntary and affirmative act rendering performance apparently or actually impossible.  In any event, repudiation must be "positive and unconditional."  An attempt to renegotiate terms will not constitute repudiation absent an unqualified refusal to perform unless the non-repudiating party accedes.

---

[64]  Transcript of Mar. 27, 2008 Teleconference, at pp. 36-40, *James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, No. 3637-VCL (Del. Ch.) (Apr. 9, 2008, No. 17)

[65]  *Manley v. Assocs. in Obstetrics & Gynecology, P.A.*, C.A. No. 00c-06-049, 2001 Del. Super. LEXIS 314, 20-21 (Del. Super. Ct. July 27, 2001) (citations and internal quotations omitted).  *See also Frontier Oil v. Holly Corp.*, C.A. No. 20502, 2005 WL 1039027, at *27 (Del. Ch. Apr. 29, 2005) ("An unequivocal statement by a promisor that he will not perform his promise is the essential underpinning for a repudiation claim." (internal quotations and citations omitted).

> A party confronted with repudiation may respond by (i) electing to treat the contract as terminated by breach, (ii) by lobbying the repudiating party to perform, or (iii) by ignoring the repudiation. Although perhaps counterintuitive, whether repudiation amounts to a present breach is predicated on the promisee's response. Unless the non-repudiating party relies upon the repudiation or notifies the promisor that it considers the repudiation final, the promisor may retract his repudiation, thereby returning the parties to the status quo ante. Once the promisee relies on the repudiation--*e.g.*, by filing suit for damages or by engaging in a substitute transaction--or notifies the promisor it regards the repudation [sic] as final, effective retraction is no longer possible.[66]

An expression of doubt as to whether the ability to perform in accordance with the contract will exist when the time comes is not a repudiation.[67] The Delaware Chancery Court has held that the statement must have sufficient clarity and precision in order to meet the test for anticipatory repudiation.[68]

James Cable has not plead a plausible claim for an unequivocal statement by Broadstripe concerning their non-performance. James Cable has established that

---

[66] *West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, C.A. No. 2742, 2009 Del. Ch. LEXIS 23, *14-16 (Del. Ch. Feb. 23, 2009) (citations and internal quotations omitted). *Aeroglobal Capital Mgmt., LLC v. Cirrus Indus.*, C.A. No. 01C-08-089, 2004 Del. Super. LEXIS 36 (Del. Super. Ct. Jan. 29, 2004) ("Anticipatory repudiation is an unequivocal statement by a promisor that he will not perform his promise and gives the injured party an immediate claim to damages for total breach, in addition to discharging the remaining duties of performance. The non-repudiating party must establish that there was an outright refusal to perform under the contract.").

[67] *Elliott Associates, L.P. v. Bio-Response, Inc.*, Civ. A. No. 10624, 1989 WL 55070, at *3 (Del. Ch. May 23, 1989) (*quoting* 4 CORBIN ON CONTRACTS § 974 (1951)). *See also Aeroglobal Capital Mgmt., LLC v. Cirrus Indus.*, C.A. No. 01C-08-089, 2004 Del. Super. LEXIS 36 (Del. Super. Ct. Jan. 29, 2004); *Brasby v. Morris*, C.A. No. 05C-10-022-RFS, 2007 Del. Super. LEXIS 73, at *13 (Del. Super. Mar. 29, 2007).

[68] *Frontier Oil Corp. v. Holly Corp.*, C.A. No. 20502, 2005 Del. Ch. LEXIS 57, at *102-03 (Del. Ch. Apr. 29, 2005) ("The lack of clarity and precision here is the result . . . . [M]erely stating that the Board was no longer recommending a transaction (particularly in the same conversation in which a pending offer . . . was rejected) cannot, in this context, be considered a repudiation . . . .").

they had doubt as of February 2008 that Broadstripe would not perform, but have not plead facts, taken as true,[69] that Broadstripe made clear and precise statements concerning their nonperformance as of that time.  Therefore, the Court finds that there is no facially plausible claim for anticipatory repudiation by clear and precise statements by Broadstripe that it would not perform in February 2008.

(c)     Conclusion

Even if this Court were to apply Restatement §251 entitling James Cable to demand adequate assurance of future performance, James Cable failed to establish a closing date in February 2008 which would trigger Broadstripe's duty to perform. Furthermore, there is no facially plausible claim that Broadstripe made any clear and precise statement giving rise to a claim for anticipatory repudiation.  As such, the Court dismisses the anticipatory repudiation claim.[70]

b.  *Count II: The Claim of Bad Faith Breach of Contract Against Broadstripe.*

In count II of the Complaint, James Cable asserts that Broadstripe's refusal to honor the APA was done tortiously and in bad faith,[71] and as a result James Cable has been damaged by such breach.[72]  Broadstripe counters in its motion that a "bad faith breach of contract" claim does not exist under Delaware law.  James counters that "bad faith breach" exists and works in tandem with a claim of civil conspiracy.  As

---

[69]  *See Fowler*, 578 F.3d at 210-11.

[70]  As the Court is dismissing the anticipatory repudiation claims, the Court is not addressing whether James Cable's subsequent efforts to close the APA "reaffirmed" the APA.

[71]  *See* note 9, *supra*.

[72]  Complaint, ¶¶155-160.

discussed *infra*, the claims for civil conspiracy must be dismissed as all claims against Highland were dismissed by the Chancery Court. However, the Complaint does not limit the claim to the civil conspiracy count nor does it allege that such claim is related to Broadstripe's actions in relation to Highland.

James Cable argues that Broadstripe engaged in a plan to obfuscate and delay closing under the APA to avoid its obligation to pay the purchase price, and that these actions constituted a breach of the implied covenant of good faith and fair dealing. James Cable seeks damages in the amount in excess of $25 million related to this breach. Broadstripe advocates dismissing this count because (i) the implied covenants of good faith and fair dealing are employed to analyze unanticipated developments or fill gaps in a contract's provisions, and in this case there were no unanticipated developments; and (ii) James Cable is seeking the same damages under its breach of contract claims and its bad faith claim, only allowing James Cable broader access in discovery yet attaining no different a result. James Cable responds that Broadstripe's actions went beyond a simple breach of contract in that Broadstripe knowingly put forth legally and factually baseless claims that James Cable breached the APA in order to avoid closing the transaction.

Delaware courts have "recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled."[73] The

---

[73] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citations and internal quotations omitted). *See also AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*, C.A. No. 4021-VCS, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009).

"implied covenant of good faith and fair dealing is recognized only where a contract is silent as to the issue in dispute."[74]

> Absent a contractual provision dictating a standard of conduct, there is no legal difference between breaches of contract made in bad faith and breaches of contract not made in bad faith.  Both are simply breaches of the express terms of the contract.[75]

Taking all the facts in the Complaint as true,[76] it appears that James Cable has alleged behavior that may give rise to a breach of contract claim, including whether Broadstripe breached the contract by raising inappropriate grounds for terminating the APA.  While such actions, taking the allegations in the Complaint as true, create a plausible breach of contract claim there are not facts that give rise to another cause of action nor are the elements of such cause of action enumerated in the Complaint.  It is not facially plausible that James Cable has a claim for implied breach of good faith and dealing.

   c.  *Count IV: The Claim of Civil Conspiracy Against Broadstripe.*

The Complaint also contains various claims against Highland, however these counts were dismissed by the Chancery Court, including the claim of civil conspiracy (Count IV).  A prima facie showing of civil conspiracy requires proof of

---

[74] *AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*, C.A. No. 4021-VCS, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009).

[75] *AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*, C.A. No. 4021-VCS, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009) (citations omitted).  *See* 17A Am.Jur.2d Contracts §712 ("[A]llegations of malicious, knowing, wanton and willful behavior do not give rise to a separate tort action where no wrongful conduct, except the breach of contract, is asserted.").

[76] *Fowler*, 578 F.3d at 210-11.

"(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage."[77]   The Chancery Court has held that James Cable failed to adequately allege that Highland engaged in any wrongdoing and dismissed the Complaint as against Highland, including the claim of civil conspiracy.[78]   The Court, through principles of judicial comity, should not disturb the Chancery Court's opinion.   As such, James Cable cannot assert claims of "civil conspiracy" solely against Broadstripe; therefore, the Court dismisses the civil conspiracy claim peremptorily.

## CONCLUSION

For the foregoing reasons, the Court dismisses the portion of Count I of the Complaint for anticipatory repudiation, dismisses Count II of the complaint for bad faith breach of contract, and dismisses Count IV of the Complaint for civil conspiracy.

The Court issued an order consistent with the findings set forth herein on May 4, 2010.[79]

---

[77]  *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987), *see also Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.)*, 375 B.R. 112, 119 (Bankr. D. Del. 2007).   *Accord Petula v. Mellody*, 588 A.2d 103, 107 (Pa. Commw. Ct. 1991) (*citing Burnside v. Abbott Laboratories*, 505 A.2d 973 (Pa. Super. Ct. 1985)) ("To state a cause of action for civil conspiracy, a complaint must allege that two or more persons combined or agreed to commit an unlawful act or to do an otherwise lawful act by unlawful means.").

[78]  *James Cable,* 2009 Del. Ch. LEXIS 102, at *28-29.

[79]  D.I. 104.